SAMUEL, Judge.
This is a suit on an oral contract between plaintiffs and defendant for architectural services. Plaintiffs, who are architects, seek $7,500 for preliminary and final drawings in connection with the proposed erection of a 34 unit apartment complex in the Parish of Jefferson. Defendant answered, contending the sum agreed upon for preliminary drawings was $500 and that the fee sought was conditioned upon securing financing for the project. No financing ever having been secured, defendant prayed that all demands in excess of $500 be dismissed.
Judgment was rendered in the trial court in favor of plaintiffs in the sum of $500. Plaintiffs have appealed seeking an increase to the sum of $7,500.
The record reveals the following undisputed facts:
Defendant was a one-third owner in in-división (his two nephews owned the other two-thirds) of a square of ground on which he desired to erect an apartment complex. In furtherance thereof he visited the office of plaintiffs and discussed the matter with Mr. George Saunders, a plaintiff partner, in the latter part of 1963. At that time it was agreed plaintiffs would draw plans which defendant would use in an effort to secured financing. The cost of these plans, as agreed at the first meeting, was $500 and was to be paid whether or not financing was secured. Following completion of the plans, defendant made an application for a loan and was advised by the lending agency it could lend $280,000 for the project. Plaintiffs then contacted a Mr. Scheyd, a building contractor, whose estimated cost for construction was $297,-000. Defendant subsequently agreed to allow Scheyd to supervise construction for a fee of $15,000 if adequate financing was received.
A number of meetings took place thereafter among defendant, plaintiffs and Scheyd. One or both of the other co-owners of the property were present at some of these meetings. At one of the later meetings defendant was advised more definitive plans and specifications would be necessary to obtain a fixed bid. These plans required the services of electrical, structural and other engineers. Although no written contract ever was entered into, a final fee of $10,000 (to include the $500 for preliminary plans) was agreed upon between plaintiffs and defendant, and definitive plans and specifications were drawn.
The lenders initially interested in backing the project rescinded their offer, no further financing was secured, the project was abandoned, and the owners sold the property in 1966. Thereafter, plaintiffs invoiced defendant for $2,700 representing alleged out-of-pocket expenses for various engineering services.
It is plaintiffs’ position that the $10,000 fee was to be paid as follows: 25% upon completing the preliminary drawings; an additional 50% when the working drawings were finished, and the remaining 25% when the job was completed (apartment complex built) and accepted. The final 25% apparently would include supervision and as the work never was begun the amount claimed in this suit does not in- *718 elude that 25%. It is defendant’s position that the $10,000 fee was contingent upon securing financing and actually building the project and since he could not secure financing and no construction was begun, no amount was due except $500 for the preliminary drawings.
The question presented is one of fact: Was the $10,000 fee contingent upon securing financing and building the project (or either), or was 75% of that fee ($7,500) due when final plans and specifications were submitted? Contained in the record relative to that question is documentary evidence and the testimony of Saunders, Bayhi and Scheyd.
Saunders’ version of the $10,000 agreement is: Three or four months after the last draft of the preliminary drawings was submitted he met with Bayhi, Scheyd and possibly Mr. Pumila (a real estate consultant) in an effort to get the building price down. At that time Scheyd stated more definitive drawings would be required to arrive at a lower fixed price. Saunders explained to Bayhi this would entail expenses other than those of his office because structural, mechanical and electrical engineering drawings were necessary. Bayhi suggested an overall fee of $10,000 and Saunders agreed. This fee was to include the preliminary plans and specifications and all engineering, as well as architectural, fees.
Saunders stated that although normally 25% of the architectural fee is due when preliminary drawings are complete, 50% additional is due when final plans and specifications are submitted, and the remaining 25% balance is due when the building is completed and accepted, he told Bayhi that since he (Bayhi) was trying to get his money from a lending agency “we would go with him as far as we could, so that he wouldn’t have to dig into his pocket, and we could go on working with him”.
Mr. Bayhi’s version of the agreement is that after the preliminary drawings (for which he had agreed to pay $500) were completed and submitted to the lending agency, at one of their meetings he told Saunders and Scheyd they would have to get the price down because he could only get a loan commitment for $280,000. While they may have mentioned needing more detailed plans requiring engineering services, except for test pilings to which he agreed, and for which he paid the sum of $400, he was not advised of any further costs to him unless he got a loan. Had he been told an additional $2,700 in engineering services would have been needed he would not have agreed. Because everything was contingent upon his securing a loan, he discussed a flat fee rather than one on a percentage basis. He agreed to Saunders’ suggestion of a $10,000 fee to be paid when the loan was obtained and construction was completed.
Scheyd testified that at a meeting with Saunders and Bayhi in the architects’ office sometime after November 3, 1963, after he had made a building estimate predicated on the preliminary drawings, he was asked by Bayhi for a final maximum cost figure. To arrive at an exact cost, Scheyd required a permanent working set of drawings. He did not recall any mention of the cost of these drawings discussed at that meeting, but he did recall discussing the need for engineers, although not in terms of dollars.
In this court plaintiffs contend: (1) by his silence and inaction defendant impliedly consented to the $10,000 fee; (2) defendant’s unwillingness to sign a personal note and his failure to make more than one loan application prevented his securing adequate financing; and (3) defendant having knowingly allowed work to be done on his behalf, and having received the benefits therefrom, the court should invoke equity and compensate plaintiffs for the work performed. We do not agree with any of these contentions.
It is plaintiffs’ position that when defendant learned a more detailed set of plans was necessary and that this would in *719 volve additional engineers, he knew, or should have known, that the cost for these plans and services went beyond the $500 fee he had agreed to pay for the original plans, and that the fact he voiced no objection and remained silent indicated his assent to such payment at his cost, pointing to defendant’s payment of the additional $400 expense for a pile driving test as an acknowledgment of this understanding.
In our opinion, the record establishes that defendant understood the cost of this test was extra, but he believed the other additional costs involved were not to be charged to him unless the apartment was built. At no time does it appear that during any of the negotiations defendant ever was advised that if financing was not secured he would be responsible for the payment of additional engineering fees. Yet, on December 14, 1964, after the agreement upon which they depend allegedly had been entered into, plaintiffs wrote to defendant sending him invoices for the engineering fees and a bill for $500 for work done by plaintiffs. This letter was introduced in evidence by plaintiffs.
Had the contractual agreement been that three-fourths of the fee was due when final plans and specifications had been completed defendant’s bill should have been in the amount of $7,500 with no separate invoices from the engineers. The letter is not a compromise offer of an existing agreement. On the contrary, it suggests that if the job was reactivated, this money would be deductible from the final fee. It is not compatable with Saunders’ testimony that 75% was due when the plans and specifications were completed, regardless of whether or not financing was secured.
Regarding plaintiffs’ second and third contentions, the record does not reflect that the defendant made only one effort to secure financial backing. On the contrary, it shows he obtained the assistance of a real estate consultant and went to other lending agencies; plaintiffs likewise attempted to help secure financing. Defendant did testify he was interested in securing financing through his corporation and would have been unwilling to enter into a personal obligation in order to obtain the loan. But the record only reflects the defendant did not attempt to obtain the loan on his personal endorsement and there is nothing in the record showing the financing could have been obtained by using that endorsement.
We are of the opinion that defendant’s understanding of the agreement was that no fee was due unless he could get a loan and build the project, and that it was not his intention to benefit at plaintiffs’ expense without paying for the work performed had he been able to secure such financing. If plaintiffs had any other understanding, the agreement could easily have been reduced to writing. Nor does it appear that defendant has unjustly benefit-ted from plaintiffs’ work; to the contrary, he received no benefit from any work other than the preliminary drawings.
The trial court found that no fee other than the original $500 was due under the agreement unless financing was obtained and, under LSA-C.C. Arts. 2038 and 2043, that suspensive condition never having been fulfilled, the obligation to pay the full fee did not come into existence. We agree with the finding and the conclusion.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.